UNITED STATES of America,
Plaintiff,

v.

Weldon ANGELOS, Defendant.

No. 2:02–CR–00708PGC.

United States District Court,
D. Utah,
Central Division.

Nov. 16, 2004.

---

Jeffrey B. Sklaroff, Harry H. Rimm, Greenberg Traurig LLP, New York, NY, amicus.

Jerome H. Mooney, Mooney Law Firm, Salt Lake City, UT, for Defendant.

Richard W. Daynes, Robert A. Lund, U.S. Attorney's Office, for Plaintiff.

## MEMORANDUM OPINION AND ORDER IMPOSING DENYING MOTION TO FIND 18 U.S.C. § 924(c) UNCONSTITUTIONAL, IMPOSING SENTENCE, AND RECOMMENDING EXECUTIVE CLEMENCY

CASSELL, District Judge.

### TABLE OF CONTENTS

Introduction ............................................................. 1230

I. Factual Background ................................................... 1231

II. Legislative History and Judicial Interpretation of § 924(c) ..................... 1233

III. Mr. Angelos' Equal Protection Challenge to the Statute ........................ 1235
 A. Equal Protection Review of Criminal Statutes ............................ 1235
 1. General Equal Protection Principles ................................. 1235
 2. The Court's Obligation to Search for a Rational Basis .................. 1237
 B. The Irrationality of § 924(c) .......................................... 1239
 1. Mr. Angelos Effectively Receives a Life Sentence Under § 924(c) ....... 1239
 2. Unjust Punishment from § 924(c) ................................... 1239
 3. Irrational Classifications ........................................... 1243
 a. Classifications Between Offenses ................................. 1243
 b. Irrational Classifications Between Offenders ...................... 1248
 4. Demeaning Victims of Actual Violence and Creating the Risk of Backlash ... 1251
 C. Justifications for § 924(c) ............................................ 1252

IV. Cruel and Unusual Punishment ......................................... 1256
 A. Mr. Angelos' Offenses and the Contemplated Penalty ..................... 1257
 B. Comparison to Penalties for Other Offenses ............................. 1258
 C. Comparison to Other Jurisdictions ..................................... 1259
 D. Application of the Harmelin Factors in Light of Davis .................... 1259

V. Calculating the Sentence ............................................... 1260

VI. Recommendations to Other Branches of Government ......................... 1261
 A. Recommendation for Executive Commutation ............................ 1261

B. Recommendation for Legislative Reform ............................1262

CONCLUSION ......................................................1263

## Introduction

Defendant Weldon Angelos stands now before the court for sentencing. He is a twenty-four–year-old first offender who is a successful music executive with two young children. Because he was convicted of dealing marijuana and related offenses, both the government and the defense agree that Mr. Angelos should serve about six to eight years in prison. But there are three additional firearms offenses for which the court must also impose sentence. Two of those offenses occurred when Mr. Angelos carried a handgun to two $350 marijuana deals; the third when police found several additional handguns at his home when they executed a search warrant. For these three acts of possessing (not using or even displaying) these guns, the government insists that Mr. Angelos should essentially spend the rest of his life in prison. Specifically, the government urges the court to sentence Mr. Angelos to a prison term of no less than 61½ years— six years and a half (or more) for drug dealing followed by 55 years for three counts of possessing a firearm in connection with a drug offense. In support of its position, the government relies on a statute—18 U.S.C. § 924(c)—which requires the court to impose a sentence of five years in prison the first time a drug dealer carries a gun and twenty-five years for each subsequent time. Under § 924(c), the three counts produce 55 years of additional punishment for carrying a firearm.

The court believes that to sentence Mr. Angelos to prison for the rest of his life is unjust, cruel, and even irrational. Adding 55 years on top of a sentence for drug dealing is far beyond the roughly two-year sentence that the congressionally-created expert agency (the United States Sentencing Commission) believes is appropriate

for possessing firearms under the same circumstances. The 55–year sentence substantially exceeds what the jury recommended to the court. It is also far in excess of the sentence imposed for such serious crimes as aircraft hijacking, second degree murder, espionage, kidnapping, aggravated assault, and rape. It exceeds what recidivist criminals will likely serve under the federal "three strikes" provision. At the same time, however, this 55–year additional sentence is decreed by § 924(c).

The court's role in evaluating § 924(c) is quite limited. The court can set aside the statute only if it is irrational punishment without any conceivable justification or is so excessive as to constitute cruel and unusual punishment in violation of the Eighth Amendment. After careful deliberation, the court reluctantly concludes that it has no choice but to impose the 55 year sentence. While the sentence appears to be cruel, unjust, and irrational, in our system of separated powers Congress makes the final decisions as to appropriate criminal penalties. Under the controlling case law, the court must find either that a statute has no conceivable justification or is so grossly disproportionate to the crime that no reasonable argument can be made its behalf. If the court is to fairly apply these precedents in this case, it must reject Mr. Angelos' constitutional challenges. Accordingly, the court sentences Mr. Angelos to a prison term of 55 years and one day, the minimum that the law allows.

To correct what appears to be an unjust sentence, the court also calls on the President—in whom our Constitution reposes the power to correct unduly harsh sentences—to commute Mr. Angelos' sentence to something that is more in accord with just and rational punishment. In particular, the court recommends that the Presi-

dent commute Mr. Angelos' sentence to no more than 18 years in prison, the average sentence that the jurors in this case recommended. In addition, the court also calls on Congress to modify § 924(c) so that its harsh provisions for 25–year multiple sentences apply only to true recidivist drug offenders—those who have been sent to prison and failed to learn their lesson. Because of the complexity of these conclusions, the court will set out their basis at some length.

## I. Factual Background

Weldon Angelos is twenty-four years old. He was born on July 16, 1979, in Salt Lake City, Utah. He was raised in the Salt Lake City area by his father, Mr. James B. Angelos, with only minimal contact with his mother. Mr. Angelos has two young children by Ms. Zandrah Uyan: six–year-old Anthony and five-year-old Jessie. Before his arrest Mr. Angelos had achieved some success in the music industry. He started Extravagant Records, a label that produces rap and hip hop music. He had worked with prominent hip hop musicians, including Snoop Dogg, on the "beats" to various songs and was preparing to record his own album.

The critical events in this case are three "controlled buys" of marijuana by a government informant from Mr. Angelos. On May 10, 2002, Mr. Angelos met with the informant, Ronnie Lazalde, and arranged a sale of marijuana. On May 21, 2002, Mr. Angelos completed a sale of a eight ounces of marijuana to Lazalde for $350. Lazalde observed Mr. Angelos' Glock pistol by the center console of his car. This drug deal formed the basis for the first § 924(c) count.

During a second controlled buy with Lazalde, on June 4, 2002, Mr. Angelos lifted his pant leg to show him the Glock in an ankle holster. Lazalde again purchased approximately eight ounces of marijuana for $350. This deal formed the basis for the second § 924(c) count.

A third controlled buy occurred on June 18, 2002, with Mr. Angelos again selling Lazalde eight ounces of marijuana for $350. There was no direct evidence of a gun at this transaction, so no § 924(c) count was charged.

On November 15, 2003, police officers arrested Mr. Angelos at his apartment pursuant to a warrant. Mr. Angelos consented to a search. The search revealed a briefcase which contained $18,040, a handgun, and two opiate suckers. Officers also discovered two bags which contained approximately three pounds of marijuana. Officers also recovered two other guns in a locked safe, one of which was confirmed as stolen. Searches at other locations, including the apartment of Mr. Angelos' girlfriend, turned up several duffle bags with marijuana residue, two more guns, and additional cash.

The original indictment issued against Mr. Angelos contained three counts of distribution of marijuana,[1] one § 924(c) count for the firearm at the first controlled buy, and two other lesser charges. Plea negotiations began between the government and Mr. Angelos. On January 20, 2003, the government told Mr. Angelos, through counsel, that if he pled guilty to the drug distribution count and the § 924(c) count, the government would agree to drop all other charges, not supersede the indictment with additional counts, and recommend a prison sentence of 15 years. The government made clear to Mr. Angelos that if he rejected the offer, the government would obtain a new superseding indictment adding several § 924(c) counts that could lead to Mr. Angelos facing more than 100 years of mandatory prison time.

---

1. 18 U.S.C. § 841(b)(1).

In short, Mr. Angelos faced the choice of accepting 15 years in prison or insisting on a trial by jury at the risk of a life sentence. Ultimately, Mr. Angelos rejected the offer and decided to go to trial. The government then obtained two superseding indictments, eventually charging twenty total counts, including five § 924(c) counts which alone carried a potential minimum mandatory sentence of 105 years. The five § 924(c) counts consisted of two counts for the Glock seen at the two controlled buys, one count for three handguns found at his home, and two more counts for the two guns found at the home of Mr. Angelos' girlfriend.

Perhaps recognizing the gravity of the situation, Mr. Angelos tried to reopen plea negotiations, offering to plea to one count of drug distribution, one § 924(c) count, and one money laundering count. The government refused his offer, and the case proceeded to trial. The jury found Mr. Angelos guilty on sixteen counts, including three § 924(c) counts: two counts for the Glock seen at the two controlled buys and a third count for the three handguns at Mr. Angelos' home. The jury found him not guilty on three counts—including the two additional § 924(c) counts for the two guns at his girlfriends' home. (The court dismissed one other minor count.)

Mr. Angelos' sentence is presumptively governed by the Federal Sentencing Guidelines. Under governing Guideline provisions, the bottom line is that all counts but the three § 924(c) counts combine to create a total offense level of 28.[2] Because Mr. Angelos has no significant prior criminal history, he is treated as first-time offender (a criminal history category I) under the Guidelines. The prescribed Guidelines' sentence for Mr. Ange-

los for everything but the § 924(c) counts is 78 to 97 months.

After the Guideline sentence is imposed, however, the court must then add the § 924(c) counts. Section 924(c) prescribes a five-year mandatory minimum for a first conviction, and 25 years for each subsequent conviction.[3] This means that Mr. Angelos is facing 55 years (660 months) of mandatory time for the § 924(c) convictions. In addition, § 924(c) mandates that these 55 years run consecutively to any other time imposed.[4] As a consequence, the minimum sentence that the court can impose on Mr. Angelos is 61½ years—6½ years (78 months) for the 13 counts under the Guidelines and 55 consecutive years for the three § 924 convictions. The federal system does not provide the possibility of parole, but instead provides only a modest "good behavior" credit of approximately 15 percent of the sentence. Assuming good behavior, Mr. Angelos' sentence will be reduced to "only" 55 years, meaning he could be released when he is 78 years old.

Mr. Angelos challenges this presumptive sentence on two grounds. His main argument is that § 924(c) is unconstitutional as applied to him, either because the additional 55–year sentence is irrational punishment that violates equal protection principles or is cruel and unusual punishment that violates the Cruel and Unusual Punishment Clause. His other argument is that the 78 to 97 month Guidelines sentence is unconstitutional under *Blakely v. Washington*[5] because a jury did not find the facts underlying the Guidelines calculation. The court will first address his constitutional challenges to § 924(c), then his challenge to the Guidelines sentence.

---

**2.** Tr. 9/14/04 at 27 (based on U.S.S.G. § 2D1.1(c)(7) & § 2S1.1(b)(2)(B)).

**3.** 18 U.S.C. § 924(c)(1)(A)(i) & (C)(i).

**4.** 18 U.S.C. § 924(c)(1)(D)(ii).

**5.** —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

## II. Legislative History and Judicial Interpretation of § 924(c)

Before turning to Mr. Angelos' specific challenges to § 924(c), it is helpful to understand the history of the statute. Title 18 U.S.C. § 924(c) was proposed and enacted in a single day as an amendment to the Gun Control Act of 1968 enacted following the assassinations of Martin Luther King, Jr. and Robert F. Kennedy. Congress intended the Act to address the "increasing rate of crime and lawlessness and the growing use of firearms in violent crime." [6] Because § 924(c) was offered as a floor amendment, there are no congressional hearings or committee reports regarding its original purpose,[7] and the court is left only with a few statements made during floor debate.[8] For example, Representative Poff, the sponsor of the amendment, stated that the law's purpose was to "persuade the man tempted to commit a Federal felony to leave his gun at home." [9]

As originally enacted, § 924(c) gave judges considerable discretion in sentencing and was not nearly as harsh as it has become. When passed in 1968, § 924(c) imposed an enhancement of "not less than one year nor more than ten years" for the person who "uses a firearm to commit any felony for which he may be prosecuted in a court of the United States" or "carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States." [10]

If the person was convicted of a "second or subsequent" violation of § 924(c), the additional penalty was "not less than 2 nor more than 25 years," which could not run "concurrently with any term of imprisonment imposed for the commission of such felony." [11] In the 36 years since its passage, the penalties attached to § 924(c) have been made continually harsher either by judicial interpretation or congressional action.

One of the first questions involving the provision was whether a defendant could be sentenced under § 924(c) where the underlying felony statute already included an enhancement for use of a firearm. In 1972 in *Simpson v. United States*,[12] the Supreme Court, relying on floor statements from Representative Poff, held that "the purpose of § 924(c) is already served whenever the substantive federal offense provides enhanced punishment for the use of a dangerous weapon" and that "to construe the statute to allow the additional sentence authorized by § 924(c) to be pyramided upon a sentence already enhanced under § 2113(c) would violate the established rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " [13] In 1980 in *Busic v. United States*,[14] the Court reaffirmed its decision in *Simpson* and went one step further, holding that prosecutors could not file a § 924(c) count instead of the enhancement provided for in the un-

---

**6.** H.R.REP. No. 90–1577 at 1698, 90th Cong., 2d Sess., 7 (1968), 1968 U.S.C.C.A.N. 4410, 4412.

**7.** *Cf. Jung v. Association of American Medical Colleges*, 339 F.Supp.2d 26, 42–43 (D.D.C. 2004) (noting interpretive difficulties created when legislation is passed without legislative hearings).

**8.** *Busic v. United States*, 446 U.S. 398, 405, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980).

**9.** 114 CONG. REC. 22, 231–48 (1968) (Statement of Rep. Poff).

**10.** *Simpson v. United States*, 435 U.S. 6, 7–8, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) (citing 18 U.S.C. § 924(c) (1968)).

**11.** *Id.*

**12.** 435 U.S. 6, 98 S.Ct. 909 (1977).

**13.** *Id.* at 13, 14, 98 S.Ct. 909.

**14.** 446 U.S. 398, 100 S.Ct. 1747 (1980).

derlying federal statute. Supporting its conclusion, the Court noted that in 1971 the Department of Justice had advised prosecutors not to proceed under § 924(c) if the predicate felony statute provided for " 'increased penalties where a firearm was used in the commission of the offense.' " [15]

In response to *Simpson* and *Busic*, in 1984 Congress amended § 924(c) "so that its sentencing enhancement would apply regardless of whether the underlying felony statute 'provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device.' " [16] The 1984 amendment also established a five-year mandatory minimum for use of a firearm during commission of a crime of violence.[17]

In 1986, as part of the Firearms Owner's Protection Act, Congress made § 924(c) specifically applicable to drug-trafficking crimes, and increased the mandatory minimum to ten years for certain types of firearms.[18] In later amendments, Congress increased the penalty for a "second or subsequent" § 924(c) conviction to a mandatory minimum of twenty years (then ultimately to twenty-five years).[19]

The increased penalties for "second or subsequent" § 924(c) convictions produced litigation over whether multiple convictions in the same proceeding were subject to enhanced penalties. In essence, the issue was whether Congress intended § 924(c) to be a true recidivist statute or one that increased penalties for first offenders. Most courts, including the Tenth Circuit, did not apply the twenty-year penalty when the "second" conviction was just the second § 924(c) count in an indictment.[20] But in *Deal v. United States,*[21] the Supreme Court, in a six-to-three decision, construed the statute more broadly. In *Deal,* the defendant was convicted of committing six different bank robberies on six different dates, each time using a gun. He was sentenced to five years for the first § 924(c) charge, and twenty years for each of the other five § 924(c) charges—a total of 105 years. In affirming his sentence, the Court held that a "second or subsequent" conviction could arise from a single prosecution.[22] To hold otherwise, the Court noted, would simply encourage prosecutors to file separate charges and try the defendant in separate prosecutions.[23]

Less than two weeks after *Deal,* the Court again interpreted the statute in *Smith v. United States.*[24] In *Smith,* the Court held that exchanging a gun for drugs constitutes "use" of a firearm "during and in relation to . . . [a] drug trafficking crime." [25] The Court rejected the defendant's argument that "use" of a firearm required use as a *weapon.*[26] The majority

---

**15.** *Id.* at 406, 100 S.Ct. 1747 (quoting 19 U.S. Atty's Bull. No. 3, p. 63 (U.S. Dept. of Justice, 1981)).

**16.** *United States v. Gonzales,* 520 U.S. 1, 10, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997)(citing Comprehensive Crime Control Act of 1984, Pub.L. 98–47. § 1005(a), 98 Stat. 2128–39).

**17.** *Id.*

**18.** Pub.L. No. 99–308, § 104(a)(2)(A)-(F).

**19.** Pub.L. No. 100–690, § 6212, 102 Stat. 4181, 4360 (1988).

**20.** *See, e.g., United States v. Chalan,* 812 F.2d 1302, 1315 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988).

**21.** 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).

**22.** *Id.* at 133–34, 113 S.Ct. 1993.

**23.** *Id.* at 134, 113 S.Ct. 1993.

**24.** 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

**25.** *Id.* at 225, 113 S.Ct. 2050.

**26.** *Id.* at 228, 113 S.Ct. 2050.

noted than when Congress enacted the relevant version of § 924(c) it was no doubt responding to concerns that drugs and guns were a "dangerous combination."[27] Justice Scalia argued in dissent that it was "significant" that the portion of § 924(c) relating to drug trafficking was affiliated with the pre-existing provision pertaining to use of a firearm in relation to a crime of violence.[28] He therefore thought that the word "use" in relation to a crime of violence means use as a weapon, and that this definition of use carried over to the addition of drug trafficking to the statute.[29]

The Court again interpreted § 924(c) in *United States v. Gonzales*[30] and held that a sentence under § 924(c) could not be served concurrently with an unrelated sentence from a state conviction.[31] Finally, in *Muscarello v. United States*,[32] the Court held that, as used in § 924(c), "carries" is not limited to the felon who carries the firearm on his person, but includes a gun brought to a drug transaction in the glove compartment of his vehicle.

What all this history reveals is that if the original version of § 924(c) governed Mr. Angelos' sentencing, the court could impose three separate one-year enhancements, adding a total of three years to his sentence. However, after 36 years of judicial interpretation and congressional modifications, the court is now left with a version of § 924(c) that requires a sentence of 55 years on top of a tough Guidelines sentence for drug dealing.

## III. Mr. Angelos' Equal Protection Challenge to the Statute

Mr. Angelos first contends that 18 U.S.C. § 924(c) makes arbitrary classifications and irrationally treats him far more harshly than criminals guilty of other much more serious crimes. He raises this claim as an equal protection challenge. The court will first set forth the law on such arguments and then turn to the merits of Mr. Angelos' claim.

### A. Equal Protection Review of Criminal Statutes

#### 1. General Equal Protection Principles

■■■ Mr. Angelos can raise an equal protection challenge to classifications created by a federal criminal statute like § 924(c). While the Equal Protection Clause applies only to the states,[33] "[t]he Fifth Amendment's due process clause encompasses equal protection principles."[34] Under equal protection principles, the court's review is quite limited. The Equal Protection Clause "does not enact Mr. Herbert Spencer's *Social Statistics*"[35] or any other personal view of a judge. Instead, unless a law infringes upon a fundamental right or classifies along suspect lines such as race, the court's review is

27. *Id.* at 239, 113 S.Ct. 2050.

28. *Id.* at 244, 113 S.Ct. 2050 (Scalia J., dissenting).

29. *Id.*

30. 520 U.S. 1, 117 S.Ct. 1032 (1997).

31. *Id.* at 9–10, 117 S.Ct. 1032.

32. 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998).

33. U.S. Const. amend. XIV ("No *State* shall ... deny to any person with its jurisdiction the equal protection of the laws."), *U.S. v. Lee*, 957 F.2d 778 (10th Cir.1992), *cert. denied*, 506 U.S. 978, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992).

34. *United States v. Lee*, 957 F.2d 778, 782 (10th Cir.1992) (citing *Mathews v. de Castro*, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976)).

35. *Lochner v. New York*, 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J.)

limited to determining whether there is a rational basis for the law.

Mr. Angelos does not argue that his claim is subject to a heightened standard of review. The law is well-settled on the subject.[36] As explained by the Supreme Court:

> Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees.... But a person who *has* been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual ... and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment. In this context ... an argument based on equal protection essentially duplicates an argument based on due process.[37]

 This holding places on Mr. Angelos a heavy burden of proof. First, "statutory classifications will not be set aside on equal protection grounds if any ground can be conceived to justify them as rationally related to a legitimate government interest." [38] Second, "those attacking the rationality of the legislative classification have the burden 'to negate every conceivable basis' which might support it." [39] The government "has no obligation to produce evidence to sustain the rationality of a statutory classification," [40] nor does Congress have to " 'articulate its reasons for enacting a statute' " [41] "[U]nder a rational basis analysis, [Congress] need not articulate the precise reasons why it chose to impose different sentences for different crimes; nothing in the Constitution prevents [Congress] from making classifications along non-suspect lines if there is a rational basis for doing so." [42] A statute can be both over-inclusive and under-inclusive and still pass rational basis review.[43] In sum, rational basis review is "a paradigm of judicial restraint" which "presumes that ... even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." [44] It is on this basis that the court will proceed.[45]

---

**36.** *United States v. McKissick,* 204 F.3d 1282, 1300 (10th Cir.2000) ("We review Mr. Zeigler's equal protection claim regarding the sentencing guidelines under the rational basis standard to determine whether the challenged sentence is based on an arbitrary distinction or upon a rational sentencing scheme.").

**37.** *Chapman v. United States,* 500 U.S. 453, 464–65, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citations omitted); *see also Baer v. City of Wauwatosa,* 716 F.2d 1117, 1125 (7th Cir.1983) (discrimination against felons subject to rational basis review).

**38.** *Lee,* 957 F.2d at 782 citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

**39.** *FCC v. Beach Communications, Inc.* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citations omitted).

**40.** *Heller v. Doe by Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

**41.** *Powers v. Harris,* 379 F.3d 1208, 1217 (10th Cir.2004) (citations omitted).

**42.** *Phillips v. Iowa,* 185 F.Supp.2d 992, 1008 (N.D.Iowa 2002).

**43.** *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

**44.** *Beach Communications, Inc.,* 508 U.S. at 314, 113 S.Ct. 2096.

**45.** Mr. Angelos also seeks to raise an "as-applied" challenge to § 924(c)'s rationality. It is not clear whether as-applied challenges are permitted in the context of rationality review. After all, "[n]early any statute which

### 2. The Court's Obligation to Search for a Rational Basis

■ The Tenth Circuit has also instructed that rational basis review is not limited to the arguments advanced by the parties. In the recent civil case of *Powers v. Harris*[46], the Circuit explained that even if the parties cannot conceive of a rational basis for the statute, the court is "not bound by the parties' arguments" but is " *'obligated* to seek out other conceivable reasons for validating'" the statute.[47] If this understanding of rationality review extends to criminal cases, then a defendant must not only negate all of the proposed grounds for a statute put forth by the government but also any rational basis which the court might conceive.

Such a conclusion in a criminal case, however, is problematic in light of the

defendant's due process rights at sentencing. In *Gardner v. Florida*,[48] for example, the Supreme Court, noting that a criminal defendant "has a legitimate interest in the character of the procedure which leads to the imposition of sentence,"[49] held that it was a violation of due process for a trial court to impose the death sentence based partially on confidential information in the pre-sentence report which the defendant did not have a chance to rebut at sentencing. *Gardner* was a death penalty case, and there is some question about whether the due process requirements would apply in a non-capital case.[50] But here we have effectively a sentence of life in prison—the next most serious punishment the law can impose.

■ The Tenth Circuit has also provided guidance on the procedures to be followed at sentencing hearings. For example, in *United States v. Beaulieu*,[51] the

classifies people may be irrational as applied in particular cases." *Beller v. Rumsfeld*, 632 F.2d 788, 808–09, n. 20 (9th Cir.1980). Moreover, statutes subject to rational review can be based on "assumptions" and "generalizations" which "inevitably produce seemingly arbitrary consequences in some individual cases." *Califano v. Jobst*, 434 U.S. 47, 53, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). These statutes "must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Id.* at 55, 98 S.Ct. 95. Thus, in *Rojas–Reyes v. INS*, 235 F.3d 115 (2d Cir.2000), the court rejected an as-applied challenge because it "misunderstands the nature of rational basis review, in which acts of Congress … need not result in the most just or logical result in every case to pass constitutional muster." *Id.* at 123 (citation omitted).

On the other hand, the Supreme Court and Tenth Circuit have both addressed as-applied challenges under rational basis review without questioning whether the posture of the case was appropriate. *See City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 450, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (striking down local zoning ordinance under rational basis review because irrational "as applied in this case"); *Meyer v. Nebraska*, 262 U.S. 390, 403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (concluding that Nebraska law prohib-

iting the teaching of German in public schools "as applied is arbitrary"); *United States v. Alahmad*, 211 F.3d 538, 541 (10th Cir.2000) (upholding International Parental Kidnapping Crime Act against as-applied rational basis challenge); *United States v. Doyan*, 909 F.2d 412, 416 (10th Cir.1990) (upholding U.S.S.G. § 5E1.2(i) "as applied here"). In light of these possibly conflicting approaches and the seriousness of the penalties facing Mr. Angelos, the safest and fairest approach here is to give him the benefit of the doubt and consider his as-applied challenge.

**46.** 379 F.3d 1208 (10th Cir.2004).

**47.** *Id.* at 1217 (quoting *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 146 (1st Cir.2001) *cert. denied*, 534 U.S. 1021, 122 S.Ct. 548, 151 L.Ed.2d 424 (2001)).

**48.** 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

**49.** *Id.* at 357, 97 S.Ct. 1197.

**50.** Wayne R. LaFave, et al., Criminal Procedure 1240–41 (4th ed.2004).

**51.** 893 F.2d 1177 (10th Cir.1990), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990).

Tenth Circuit held that while a judge may rely on reliable hearsay at the sentencing stage, the due process clause requires that the defendant "be given adequate notice of and an opportunity to rebut or explain information that is used against him" at sentencing.[52]

These due process considerations are the basis for Rule 32(i) of the Federal Rules of Criminal Procedure, which requires the court to give the defendant a chance to refute facts in the pre-sentence report.[53] But Rule 32(i) is not limited to factual allegations in the pre-sentence report. Specifically, Rule 32(i)(1)(C) states that the Court must afford counsel for the defendant an opportunity to "comment on the probation officer's determinations *and on other matters relating to the appropriate sentence* ...."[54] Similarly, Rule 32(i)(3)(B) requires the court to make findings on any "controverted matters." A matter cannot be "controverted" if it is hypothesized by the judge and the defendant never has an opportunity to comment on it.

Rule 32 has been given an expansive reading by the Supreme Court. In *Burns v. United States*,[55] the Supreme Court considered whether a trial court could depart upwards from a Guidelines sentence *sua sponte* without notice to the defendant or the government. The Court held that Rule 32 requires that the defendant be notified beforehand of the court's intention to depart upward so that he can challenge both the factual and the legal basis for doing so.[56] As *Burns* suggests, for the trial court to reach legal conclusions without first affording notice to the parties would "render[ ] meaningless the parties' express right under Rule 32(a)(1) to 'comment upon ... matters relating to the appropriate sentence'" because the right to comment upon a departure has "'little reality or worth unless one is informed' that a decision is contemplated."[57]

If the court follows here the approach adopted by the Tenth Circuit in *Powers* for civil cases, it could hold that § 924(c) is constitutional based solely on an argument hypothesized by the court without notice to the defense. Such an approach would clash with the purpose of Rule 32, which is to "promote[ ] focused, adversarial resolution of the *legal* and factual issues" relevant to fixing a sentence.[58] In *Burns*, the Court explained that allowing *sua sponte* departures would force the parties to hypothesize every potential departure and address them "in a random and wasteful way by trying to anticipate and negate every conceivable ground on which the district court might choose to depart on its own initiative."[59]

Out of an abundance of caution, therefore, the court concludes that it should not uphold § 924(c) on grounds which the defendant has not had an opportunity to address. In reaching this conclusion, this court in no way intends to deviate from the standard rule that it is not necessary for the government to show the actual reason that Congress enacted a statute, be it civil or criminal.[60] The criminal cases supporting this rule, however, do not stand for the

---

52. *Id.* at 1181.

53. *See, e.g., United States v. Romero*, 122 F.3d 1334, 1344 (10th Cir.1997), *cert. denied*, 523 U.S. 1025, 118 S.Ct. 1310, 140 L.Ed.2d 474 (1998).

54. Fed.R.Crim.P. 32(c)(1) (emphasis added).

55. 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991).

56. *Id.* at 135–136, 111 S.Ct. 2182.

57. *Id.* at 136, 111 S.Ct. 2182 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

58. *Burns*, 501 U.S. at 137, 111 S.Ct. 2182.

59. *Id.*

60. *United States v. Lee*, 957 F.2d 778, 782 (10th Cir.1992), *cert. denied*, 506 U.S. 978, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992).

proposition that, in contrast to the ordinary rules of sentencing, the court can advance grounds to sustain a statute *sua sponte* without giving the defendant a chance to respond.[61]

Finally, the court has considered whether it might be feasible for it to conceive of grounds beyond those raised by the government or the defendant and then give the parties a further opportunity to brief and argue those additional grounds. Practical concerns, however, dictate against such an approach for a criminal sentencing, where the court must impose sentence "without unnecessary delay."[62] Presumably these same concerns were at play in the Tenth Circuit's decision in *Powers*. The Circuit did not call for additional briefing and argument there, probably because of the delay attendant to such a procedure.

In reaching this conclusion, the court does not mean to suggest that there is some clearly "winning" argument that the government has simply failed to · raise. The government has been ably represented throughout these proceedings by experienced and capable counsel. The government has briefed and argued the main grounds that can be advanced to sustain § 924(c) as applied in this case. Rather than chase down every hypothetical ground that could sustain the statute, the court will consider the grounds that have been briefed and argued in this case.

**B. The Irrationality of § 924(c)**

■ Mr. Angelos contends that § 924(c) effectively sentences him to life in prison and that this statutory scheme is irrational as applied to him. In particular, Mr. Angelos contends that § 924(c) leads to unjust punishment and creates irrational distinctions between different offenders and different offenses. The court will first review Mr. Angelos' claims about the statute's infirmities, then consider the government's defenses.

**1. Mr. Angelos Effectively Receives a Life Sentence Under § 924(c)**

Before turning to the merits of Mr. Angelos' claims, it is important to understand the length of the sentence that the government is asking the court to impose. If Angelos serves his full 61½-year sentence, he will be 85 years old upon release. Assuming the 15 percent credit for good behavior, Mr. Angelos sentence will be reduced to "only" 55 years, leading to the earliest possible release date for Mr. Angelos at 77 years of age. The average life expectancy for males in the United States is about 74 years of age.[63] Therefore, under the best case scenario, Angelos *might* live long enough to be released from prison (assuming that the harshness of prison life does not decrease his life expectancy). Put another way, if the court imposes the sentence sought by the government, Mr. Angelos will effectively receive a sentence of life.

**2. Unjust Punishment from § 924(c)**

Mr. Angelos argues that his sentence is irrational because the enhancement provided for under § 924(c) increases his sentence by 55 years, whereas were the Guidelines alone to be applied, his sentence would be enhanced by only two years. Under the Guidelines, Mr. Ange-

---

61. *See, e.g., id.* at 780 (government raising the grounds used to sustain the statute).

62. Fed. R.Crim. P. 32(b)(1).

63. Elizabeth Arias, *United States Life Tables, 2001 in* National Vital Statistics Reports, U.S.

Dep't of Health and Human Serv., Vol. 52, No. 14 (Feb. 18, 2004) *available at http:// www.cdc .gov/nchs/data/nvsr/nvsr52/nvsr52 14.pdf.*

los' sentence would have been increased by, at most, 24 months.[64] Because the relevant conduct was charged as three separate § 924(c) violations, however, the result was a sentence increased by 660 months, or 55 years. Cases such as this force the government to choose between charging defendants under § 924(c) or relying on the Guidelines' enhancement. As the Eleventh Circuit has noted, "The relationship between § 924(c) and [the Guidelines enhancement] is an 'either/or' relationship at sentencing. If a defendant is convicted [under § 924(c)], he must receive a five year consecutive sentence, but he cannot also have his base offense level enhanced pursuant to [the Guidelines enhancement] because such enhancement would violate the Double Jeopardy Clause of the United States Constitution. However, a defendant who is not convicted of a violation of § 924(c), may receive an enhancement of his base offense level for possession of a firearm in connection with a drug offense."[65] The government in this case chose to pursue § 924(c) counts rather than enhancements under the Guidelines.

The Guidelines, Mr. Angelos argues, reflect the judgment of experts appointed by Congress to determine "just punishment" for federal criminal offenses. Because his sentence, the result of 924(c), is at such discrepancy with the Guidelines determination of "just punishment," Mr. Angelos argues that his sentence is irrational.

In imposing sentences in criminal cases, the court is required by the governing statute—the Sentencing Reform Act[66]—to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [the Act]."[67] The purposes of sentencing set forth in the Sentencing Reform Act are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide *just punishment* for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[68]

To give some real content to the Sentencing Reform Act's directives, Congress established an expert body—the United States Sentencing Commission—to promulgate sentencing Guidelines for criminal offenses. The Sentencing Commission, after extensive review of sentencing practices across the country established a comprehensive set of sentencing guidelines. The Commission has carefully calibrated the Guidelines through annual amendments, and Congress has had the opportunity to reject and amend Guidelines that were not to its satisfaction.

The Guidelines provide clear guidance on what is just punishment for federal offenses. To be sure, the constitutionality of the fact-finding apparatus attached to the Guidelines is currently under Supreme Court review,[69] and this court has held that in cases such as this one the Guidelines are advisory only.[70] But the substan-

---

64. § 2D1.1(b)(1) (gun enhancement for drug offenses).

65. *United States v. Mixon*, 115 F.3d 900, 902 (11th Cir.1997) (citation omitted).

66. 18 U.S.C. § 3551 et. seq.

67. 18 U.S.C. § 3553(a).

68. 18 U.S.C. § 3553(a)(2) (emphasis added).

69. *See United States v. Booker*, —— U.S. ——, 125 S.Ct. 11, 159 L.Ed.2d 838 (2004) (granting certiorari to review this question).

70. *United States v. Croxford*, 324 F.Supp.2d 1230 (D.Utah 2004); *see also* Part V, *infra*

tive content of the Guidelines is what is relevant here. Both sides agree that the Guidelines should be considered as providing guidance on the appropriate penalty. Moreover, Congress has directed that courts must follow the Guidelines in imposing sentence unless some unusual factor justifies a departure.[71] As a result, Congress has in essence instructed the courts that the Guidelines provide "just punishment" for criminal offenses. It could hardly be otherwise, as Congress would not have gone to the trouble of having an expert body promulgate sentencing guidelines if those guidelines failed to prescribe the appropriate sentences. In short, the views of the Sentencing Commission are entitled to "great weight because the Sentencing Commission is the expert body on federal sentencing." [72]

In this case, neither side has offered any strong reason for believing that the sentence the Guidelines alone provide for would not achieve just punishment. The Guidelines specify sentences for all crimes covered by the federal criminal code, including all the crimes committed by Mr. Angelos. Setting aside the three firearms offenses covered by the § 924(c) counts, all of Mr. Angelos' other criminal conduct results in an offense level of 28. Because Mr. Angelos is a first–time offender, the Guidelines then specify a sentence of between 78 to 97 months. It is possible to determine, however, what a Guidelines sentence would be covering all of Mr. Angelos conduct, including that covered by the § 924(c) counts. If this conduct were punished under the Guidelines rather than under § 924(c), the result would be an additional two-level enhancement,[73] in-creasing the offense level from a level 28 to a level 30. This, in turn, produces a recommended Guidelines sentence for Mr. Angelos of 97 to 121 months. Thus, the Guidelines inform the court that Mr. Angelos' possession of firearms should increase his sentence by no more than 24 months (from a maximum of 97 months to a maximum of 121 months). This is a point worth emphasizing: the expert agency established by Congress to evaluate federal sentences and that the court must follow when imposing sentences has specified 24 months as the appropriate enhanced penalty for Mr. Angelos' possession of firearms and no more than 121 months as "just punishment" for all of Mr. Angelos' offenses.

Bearing firmly in mind the conclusion of Congress' expert agency that 121 months is the longest appropriate prison term for all the criminal conduct in this case, it comes as a something of a shock to then consider the § 924(c) counts. Because Mr. Angelos' possession of firearms is punished not under the Guidelines but rather under § 924(c), the court is required to impose an additional penalty of 660 months (55 years) instead of the 24 month enhancement provided for by the Guidelines. It is not at all clear how the court can reconcile these two sentences. Knowing that the congressionally-approved Guidelines provide for an additional 24 month penalty for the firearms at issue, can the court conclude that an additional 660 months is a "just punishment"? One architect of the Guidelines has recognized the problem of the discrepancy:

(discussing application of *Croxford* to this case).

**71.** 18 U.S.C. § 3553(b)(1).

**72.** *United States v. Hill*, 48 F.3d 228, 231 (7th Cir.1995); *see also Mistretta v. United States,* 488 U.S. 361, 379, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (noting Commission's status as "an expert body").

**73.** U.S.S.G. § 2D1.1(b)(1).

The compatibility of the guidelines system and mandatory minimums is also in question. While the Commission has consistently sought to incorporate mandatory minimums into the guidelines system in an effective and reasonable manner, in certain fundamental respects, the general approaches of the two systems are inconsistent.... Whereas the guidelines provide for graduated increases in sentence severity for additional wrongdoing or for prior convictions, mandatory minimums often result in sharp variations in sentences based on what are often only minimal differences in criminal conduct or prior record. Finally, whereas the guidelines incorporate a "real offense" approach to sentencing, mandatory minimums are basically a "charge-specific" approach wherein the sentence is triggered only if the prosecutor chooses to charge the defendant with a certain offense or to allege certain facts.[74]

There is, of course, the possibility that the Sentencing Guidelines are too low in this case and that mandatory minimums specify the proper sentence. The more the court investigates, however, the more the court finds evidence that the § 924(c) counts here lead to unjust punishment. For starters, the court asked the twelve jurors in this case what they believed was the appropriate punishment for Mr. Angelos. Following the trial, the court sent—over the government's objection—each of the jurors the relevant information about Mr. Angelos' limited criminal history, described the abolition of parole in the federal system, and asked the jurors what they believed was the appropriate penalty for Mr. Angelos. Nine jurors responded and gave the following recommendations: (1) 5 years; (2) 5–7 years; (3) 10 years; (4) 10 years; (5) 15 years; (6) 15 years; (7) 15–20 years; (8) 32 years; and (9) 50 years. Averaging these answers, the jurors recommended a mean sentence of about 18 years and a median sentence of 15 years. Not one of the jurors recommended a sentence closely approaching the 61½ year sentence created by § 924(c).

At oral argument, the court asked the government what it thought about the jurors' recommendations and whether it was appropriate to impose a sentence so much higher than what the jurors thought appropriate. The government's response was quite curious: "Judge, we don't know if that jury is a random representative sample of the citizens of the United States...."[75] Of course, the whole point of the elaborate jury selection procedures used in this case was to assure that the jury was, indeed, such a fair cross section of the population so that the verdict would be accepted with confidence. It is hard to understand why the government would be willing to accept the decision of the jury as to the guilt of the defendant but not as to the length of sentence that might be imposed.

More important, the jurors' answers appear to reflect a representative of what people across the country believe. The crimes committed by Mr. Angelos are not uniquely federal crimes. They could have been prosecuted in state court in Utah or elsewhere across the country. The court

---

**74.** Orrin G. Hatch, *The Role of Congress in Sentencing: The United States Sentencing Commission, Mandatory Minimum Sentences, and the Search for a Certain and Effective Sentencing System,* 28 Wake Forest L.Rev. 185, 194 (1993); *see also Neal v. United States,* 516 U.S. 284, 292, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996). *See generally* U.S. Sen- tencing Comm, Mandatory Minimum Penalties in the Federal Criminal Justice System: A Special Report to Congress 5–15 (1991) (numbers inserted and justifications reordered) (hereinafter Sentencing Comm. Mandatory Minimum Report).

**75.** Tr. 9/14/04 at 60.

asked the Probation Office to determine what the penalty would have been in Utah state court had Mr. Angelos been prosecuted there. The Probation Office reported that Mr. Angelos would likely have been paroled after serving about two to three years in prison. The government gives a substantially similar estimate, reporting that on its understanding of Utah sentencing practices Mr. Angelos would have served about five to seven years in prison.[76] Even taking the higher figure from the government, the § 924(c) counts in this case result in punishment far beyond what Utah's citizens, through its state criminal justice system, provides as just punishment for such crimes.

The same conclusion obtains if the comparison is to the sentence that would be imposed in other states. Indeed, the government conceded that Mr. Angelos' federal sentence after application of the § 924(c) counts is more than he would have received in any of the fifty states.[77]

Of course, one way of determining what people across the country believe is to look to the actions of Congress. Congress serves as the nation's elected representatives, so actions taken by Congress presumably reflect the will of the people. The difficulty here is that Congress has taken two actions: (1) it created the Sentencing Commission and (2) adopted § 924(c). As between these two conflicting actions, the sentences prescribed by the Sentencing Commission more closely reflect the views of the country. And, indeed, empirical research has demonstrated that the Sentencing Guidelines generally produce sentences that are at least as harsh as those

that the public would wish to see imposed.[78]

In sum, the court is faced with the fact that § 924(c) produces punishment in this case far beyond that called for by the congressionally-created expert agency on sentencing, by the jurors who heard the evidence, by the Utah state system, or by any of the other state systems. If the court is to take seriously the directive that it should impose "just punishment" with its sentences, then it should impose sentences that are viewed as appropriate by the citizens of this state and of this country. The court concludes that placing Mr. Angelos in prison for 61½ years is not "just punishment" for his crimes. This factor suggests the irrationality of § 924(c).

### 3. Irrational Classifications

The next factor the court should consider is Mr. Angelos' argument that § 924(c) creates irrational classifications, between different offenses and different offenders. The court will consider each of these arguments in turn.

#### a. Classifications Between Offenses

Mr. Angelos contends that his § 924(c) sentence is not only unjust but also irrational when compared to the punishment imposed for other more serious federal crimes. Perhaps realizing where this evaluation will inevitably lead, the government initially argues that any comparison is futile because, as the Supreme Court suggested in its 1980 decision *Rummel v. Estelle*, different "crimes ... implicate other societal interests, making any comparison inherently speculative."[79] At

---

76. Government's Resp. Mem. Re: Constitutionality of Mandatory Minimum Sentences Pursuant to 18 U.S.C. § 924(c) at 23 n. 19 (Apr. 8, 2004).

77. *Id.* at 23 n. 18.

78. Peter H. Rossi & Richard A. Berk, Just Punishments: Federal Guidelines and Public Views Compared (1998).

79. *Rummel v. Estelle*, 445 U.S. 263, 282 n. 27, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

some level, this argument is correct; fine distinctions between the relative severity of some kinds of crimes are hard to make. It is difficult to compare, as *Rummel* points out, the crime of embezzlement of millions of dollars with the crime of taking a small amount of money at gun point.[80]

But general comparisons of crimes are possible. Some crimes have, for example, a common denominator that permits comparison. As the Supreme Court clarified three years after *Rummel* in *Solem v. Helm,* "stealing a million dollars is viewed as more serious than stealing a hundred dollars."[81] More important, *Solem* pointed to various factors that can be assessed relatively objectively. In instructing the court to judge the gravity of the offense in the cruel and unusual punishment context, the Court noted that its holding "assumes that courts are competent to judge the gravity of an offense, at least on a relative scale. In a broad sense this assumption is justified, and courts traditionally have made these judgments—just as legislatures must make them in the first instance. Comparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender."[82] Therefore, in determining whether Congress has created irrational classifications with § 924(c), the court can be guided not by any subjective views on how harshly to punish a particular crime, but rather how the punishment for that

crime compares to that imposed for other undoubtedly more serious offenses.

In evaluating the § 924(c) counts, the court starts from the premise that Mr. Angelos committed serious crimes. Trafficking in illegal drugs runs the risk of ruining lives through addiction and the violence that the drug trade spawns. As the government properly argued, when a defendant engages in a drug-trafficking operation and "carries and possesses firearms to aid in that venture, as was the case here, the actual threat of violence always exists, even it if does not actually occur."[83] But do any of these general rationales provide a rational basis for punishing the *potential* violence which § 924(c) is meant to deter more harshly than *actual* violence that harms a victim in its wake? In other words, is it rational to punish a person who *might* shoot someone with a gun he carried far more harshly than the person who actually *does* shoot or harm someone?

As applied in this case, the classifications created by § 924(c) are simply irrational. Section 924(c) imposes on Mr. Angelos a sentence 55 years or 660 months. Added to the minimum 78–month Guidelines sentence for a total sentence of 738 months, Mr. Angelos is facing a prison term which more than doubles the sentence of, for example, an aircraft hijacker (293 months),[84] a terrorist who detonates a bomb in a public place (235 months),[85] a

---

80. *Id.* at 282 n. 27, 100 S.Ct. 1133.

81. *Solem v. Helm,* 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

82. *Id.*

83. Government's Reply Mem. to Br. of Amici Curiae Re: Constitutionality of Mandatory–Minimum Sentences and to Resp. of Angelos Re: Court Order Inviting Angelos to File Plea Negotiation History at 13 (September 10, 2004).

84. U.S.S.G. § 2A5.1 (2003) (base offense level 38). The 2003 Guidelines are used in all calculations in this opinion. All calculations assume a first offender, like Mr. Angelos, in Criminal History Category I.

85. U.S.S.G. § 2K1.4(a)(1) (cross-referencing § 2A2.1(a)(2) and enhanced for terrorism by § 3A1.4(a)).

racist who attacks a minority with the intent to kill and inflicts permanent or life-threatening injuries (210 months),[86] a second-degree murderer,[87] or a rapist.[88] Table 1 below sets out these and other examples of shorter sentences for crimes far more serious than Mr. Angelos'.

### Table I
### Comparison of Mr. Angelos' Sentence with Federal Sentences for Other Crimes

| Offense and Offense Guideline | Offense Calculation | Maximum Sentence |
|---|---|---|
| Mr. Angelos with Guidelines sentence plus § 924(c) counts | Base Offense Level 28 + 3 § 924(c) counts (55 years) | 738 Months |
| Kingpin of major drug trafficking ring in which death resulted U.S.S.G. § 2D1.1(a)(2) | Base Offense Level 38 | 293 Months |
| Aircraft hijacker U.S.S.G. § 2A5.1 | Base Offense Level 38 | 293 Months |
| Terrorist who detonates a bomb in a public place intending to kill a bystander U.S.S.G. § 2K1.4(a)(1) | Total Level 36 (by cross reference to § 2A2.1(a)(2) and terrorist enhancement in § 3A1.4(a)) | 235 Months |
| Racist who attacks a minority with the intent to kill U.S.S.G. § 2A2.1(a)(1) & (b)(1) | Base Level 28 + 4 for life threatening + 3 for racial selection under § 3A1.1 | 210 Months |
| Spy who gathers top secret information U.S.S.G. § 2M3.2(a)(1) | Base Offense Level 35 | 210 Months |
| Second-degree murderer U.S.S.G. § 2A1.2 | Base Offense Level 33 | 168 Months |
| Criminal who assaults with the intent to kill U.S.S.G. § 2A2.1(a)(1) & (b) | Base Offense Level 28 + 4 for intent to kill = 32 | 151 Months |
| Kidnapper U.S.S.G. § 2A4.1(a) | Base Offense Level 32 | 151 Months |
| Saboteur who destroys military materials U.S.S.G. § 2M2.1(a) | Base Offense Level 32 | 151 Months |
| Marijuana dealer who shoots an innocent person during drug transaction U.S.S.G. § 2D1.1(c)(13) & (b)(2) | Base Offense Level 16 + 1 § 924(c) count | 146 Months |
| Rapist of a 10–year–old child U.S.S.G. § 2A3.1(a) & (B)(4)(2)(A) | Base Offense Level 27 + 4 for young child = 31 | 135 Months |
| Child pornographer who photographs a 12–year–old in sexual positions U.S.S.G. § 2G2.1(a) & (b) | Base Offense Level 27 + 2 for young child = 29 | 108 Months |
| Criminal who provides weapons to support a foreign terrorist organization U.S.S.G. § 2M5.3(a) & (b) | Base Offense Level 26 + 2 for weapons = 28 | 97 Months |

**86.** U.S.S.G. § 3A1.1 (base offense level 32 + 4 for life-threatening injuries + 3 for racial selection under § 3A1.4(a)).

**87.** U.S.S.G. § 2A1.2 (base offense level 33).

**88.** U.S.S.G. § 2A3.1 (base offense level 27).

| Criminal who detonates a bomb in an aircraft U.S.S.G. § 2K1.4(a)(1) | By cross reference to § 2A2.1(a)(1) | 97 Months |
|---|---|---|
| Rapist U.S.S.G. § 2A3.1 | Base Offense Level 27 | 87 Months |

The court provided these examples to the government well before the argument in this case, and invited the government to provide any corrections or additions. No changes were suggested. At oral argument, to its credit, the government conceded that at least some of the crimes in the table involved crimes more serious than those committed by Mr. Angelos. Thus, the government agreed (after extensive questioning from the court) that Mr. Angelos has committed less serious crimes than a second-degree murderer,[89] a marijuana dealer who shoots someone,[90] or a rapist.[91] The government maintained, however, that the court was not making the proper comparison. Because Mr. Angelos was convicted of three counts of violating § 924(c), the government argued, the proper comparison is between Mr. Angelos and a three-time hijacker, a three-time rapist, or a three-time second degree murderer. The government maintains that "the hijacker and kidnapper would serve much longer sentences if they were sentenced for committing those crimes three separate times."[92]

The government's argument misses the whole point of the comparison. All of Mr. Angelos' crimes taken together are less serious than, for example, even a single aircraft hijacking, a single second-degree murder, or a single rape. But even adopting the government's approach, the irrationality of the scheme only becomes more apparent. Amazingly, Mr. Angelos' sentence under § 924(c) is still far more severe than criminals who committed, for example, three aircraft hijackings, three second-degree murders, three kidnappings, or three rapes. Table II reflects a trebling of all the crimes in Table I. Mr. Angelos will receive a longer sentence than any three-time criminal, with the sole exception of a marijuana dealer who shoots three people. (Mr. Angelos still receives a longer sentence than a marijuana dealer who shoots two people.)

89. Tr. 9/14/2004 at 66.

90. *Id.* at 55.

91. *Id.* at 67.

92. Government's Resp. Mem. Re: Constitutionality of Mandatory Minimum Sentences Pursuant to 18 U.S.C. § 924(c) at 20 (Apr. 8, 2004).

On a less serious note, the court agrees with the government on a subsidiary lexicographical point—that "kidnapper" is properly spelled with two *p's* rather than one. The court acknowledges the contrary argument of Judge Boyce, who argues for the single *p* spelling. ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 229 (1982). The court, however, finds persuasive the arguments of the nation's leading legal stylist—Bryan Garner—who notes (among other arguments) that a double *p* is used about five to ten times as often as a single *p*. BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 494 (2d ed.1995). Moreover, in this case, both Congress (*see* 18 U.S.C. § 1201) and the Sentencing Commission (*see* U.S.S.G. § 2A4.1) have used the double *p* spelling. Finally, while the Tenth Circuit has used both versions, it seems to prefer the double *p*. *See, e.g., United States v. Wooten*, 377 F.3d 1134 (10th Cir.2004) (using kidna*pp*ing).

## Table II
### Comparison of Mr. Angelos' Sentence with Federal Sentences for Other Crimes Committed Three Times

| Offense Guideline | Offense Calculation | Maximum Sentence |
|---|---|---|
| Mr. Angelos with Guidelines sentence plus § 924(c) counts | Base Offense Level 28 + 3 § 924(c) counts (55 years) | 738 Months |
| Kingpin of three major drug trafficking rings in which three deaths resulted | Base Offense Level 38 + 3 units = 41 | 465 Months |
| Three-time aircraft hijacker | Base Offense Level 38 + 3 units = 41 | 405 Months |
| Terrorist who detonates three bomb in public places intending to kill a bystander | Total Offense Level 35 + 3 units = 38 | 293 Months |
| Racist who attacks three minorities with the intent to kill | Total Offense Level 29 + 3 units = 32 | 151 Months |
| Spy who gathers top secret information three times | Base Offense Level 35 + 3 units = 38 | 293 Months |
| Second-degree murderer of three victims | Base Offense Level 33 + 3 units = 36 | 235 Months |
| Criminal who assaults three people with the intent to kill | Total Offense Level 32 + 3 units = 35 | 210 Months |
| Kidnapper of three persons | Total Offense Level 32 + 3 units = 35 | 210 Months |
| Saboteur who destroys military materials three times | Base Offense Level 32 + 3 units = 35 | 210 Months |
| Marijuana dealer who shoots three innocent persons during three drug transactions | Base Offense Level 16 + 3 § 924(c) counts | 813 Months |
| Rapist of three 10–year–old children | Total Offense Level 31 + 3 units = 34 | 188 Months |
| Child pornographer who photographs three 12–year–old children in sexual positions | Total Offense Level 29 + 3 units = 32 | 151 Months |
| Criminal who provides weapons to support three foreign terrorist organizations | Total Offense Level 263 counts grouped under § 3D1.2(b) | 78 Months |
| Criminal who detonates three bombs in three aircraft | Total Offense Level 28 + 3 units = 31 (by cross reference to § 2A2.1(a)(1)) (3 counts) | 135 Months |
| Rapist who rapes three victims | Total Offense Level 27 + 3 units = 30 | 121 Months |

The irrationality of these differences is manifest and can be objectively proven. In the Eighth Amendment context, the Supreme Court has instructed that "[c]omparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender." [93]

In contrast to the serious violent felonies listed in tables I and II, the crimes committed by Mr. Angelos had the *potential* for violence, but no *actual* violence occurred. This is not to say that trafficking in illegal drugs is somehow a non-violent offense. Indeed, in *Harmelin*, Justice Kennedy quite properly called such an assertion "false to the point of absurdity." [94]

93. *Harmelin v. Michigan*, 501 U.S. 957, 1004, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy J., concurring).

94. *Id.* at 1002, 111 S.Ct. 2680 (Kennedy J., concurring).

*Harmelin* involved the potential distribution of approximately 32,500 doses of cocaine, a highly addictive drug that was linked to many of the homicides in Detroit.[95] Justice Kennedy's concurrence equated the crime in *Harmelin* with "felony murder without specific intent to kill." [96]

In this case, however, Mr. Angelos will be completely punished for his marijuana trafficking by the 78–97 month Guidelines sentence he receives. The § 924(c) counts pile on an additional 55 years *solely* for three offenses of possessing firearms in connection with that trafficking. He receives a five-year and then another twenty-five-year sentence for counts 2 and 4, which involved carrying a gun in an ankle holster during a drug deal with one other person for several hundred dollars in marijuana. He receives another twenty-five-year sentence for Count 10, which involved three handguns found in Angelos' apartment during the execution of a search warrant. Section 924(c) punishes Angelos more harshly for crimes that threaten potential violence than for crimes that conclude in actual violence to victims (e.g., aircraft hijacking, second-degree murder, racist assaults, kidnapping, and rape). This factor, therefore, also suggests the irrationality of § 924(c).

### b. Irrational Classifications Between Offenders

Mr. Angelos also argues that § 924(c) is irrational in failing to distinguish between the recidivist and the first-time offender. Section 924(c) increases penalties for a "second or subsequent conviction under this subsection." [97] This language can be interpreted in two different ways. One construction would be that an offender who is convicted of a § 924(c) violation, serves his time, and then commits a subsequent violation is subject to an enhanced penalty. This was the construction that the Tenth Circuit (among other courts) originally gave to the statute.[98]

Another, far more expansive construction would be that an offender who is convicted of two or more counts is subject to an enhanced penalty for each count after the first count of conviction. In 1993 in *Deal v. United States*,[99] the Supreme Court adopted this second construction, reading the "second or subsequent" language in § 924(c) to apply equally to the recidivist who is convicted of violating § 924(c) on separate occasions after serving prison time and to the defendant who is convicted of multiple § 924(c) counts in the same proceeding stemming from a single indictment. The Court concluded (over the dissents of three Justices) that the unambiguous phrase "subsequent conviction" in the statute permitted no distinction between the time at which the convictions took place.[100] In addition, all time imposed for each § 924(c) count must run consecutively to any other sentence.[101] This is what is known as "count stacking."

When multiple § 924(c) counts are stacked on top of each other, they produce lengthy sentences that fail to distinguish between first offenders (like Mr. Angelos) and recidivist offenders. As John R.

95. *Id.* at 1002–03, 111 S.Ct. 2680 (Kennedy, J., concurring).

96. *Id.* at 1004, 111 S.Ct. 2680 (Kennedy, J., concurring).

97. 18 U.S.C. § 924(c)(1).

98. *United States v. Abreu*, 962 F.2d 1447, 1450 (10th Cir.1992) (en banc)(*cert. granted,*

*judg. vacated,* 508 U.S. 935, 113 S.Ct. 2405, 124 L.Ed.2d 630 (1993)).

99. 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).

100. *Id.* at 132–33, 113 S.Ct. 1993.

101. 18 U.S.C. § 924(c)(1)(D)(ii).

Steer, Vice Chair of the United States Sentencing Commission, has explained:

[C]onsider the effects if prosecutors pursued every possible count of 18 U.S.C. § 924(c).... The statute provides for minimum consecutive sentence enhancements of 25 years to life for the second and subsequent conviction under the statute, even if all the counts are charged, convicted, and sentenced at the same time. Pursuing multiple § 924(c) charges at the same time has been called "count stacking" and has resulted in sentences of life imprisonment (or aggregate sentences for a term of years far exceeding life expectancy) for some offenders with little or no criminal history.[102]

Consider the way in which the § 924(c) counts stack up on Mr. Angelos. He is currently 24 years old. He is to receive at least 78 months for the underlying offenses. Stacked on top of this is another 5 years for the first § 924(c) conviction. Stacked on top of this is another 25 years for the second § 924(c) conviction. And finally, another 25 years is stacked on top for the third § 924(c) conviction. Even assuming credit for good time served, Mr. Angelos will be more than 55–years–old before he even begins to serve the final 25 years his sentence. This happens not because Mr. Angelos "failed to learn his lessons from the initial punishment" and committed a repeat offense. Section 924(c) jumps from a five-year mandatory sentence for a first violation to a 25–year mandatory sentence for a second violation, which may occur just days (or even hours) later. It is not a recidivist provision.

Other true recidivist statutes do not operate this way. Instead, they graduate punishment (albeit only roughly) between first offenders and subsequent offenders. California's tough three–strikes-and-you're-out law can serve as a convenient illustration. Prompted by violence from career criminals who had been in prison and released,[103] California passed a law requiring lengthy prison terms for third-time offenders, even where the third offense could be viewed as relatively minor. Last year in *Ewing v. California*,[104] the Supreme Court upheld a twenty-five to life sentence under California's three-strikes law. While defendant Ewing's third offense was merely stealing $399 worth of golf equipment, the controlling opinion noted that the policy of the law was to "incapacitat[e] and deter[ ] repeat offenders who threaten the public safety. The law was designed 'to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses.' "[105] In the end, the Court concluded that Ewing's sentence was justified "by his own long, serious criminal record [including] numerous misdemeanor and felony offenses ... nine separate terms of incarceration ... and crimes [committed] while on probation or parole."[106]

Similarly, in the earlier case of *Rummel*[107], the Court saw a critical distinction between first and repeat offenders. In

---

**102.** Statement of John R. Steer, Member and Vice Chair of the United States Sentencing Comm'n Before the ABA Justice Kennedy Comm'n 19 (Nov. 13, 2003).

**103.** *See generally* MIKE REYNOLDS & BILL JONES, THREE STRIKES AND YOU'RE OUT ... A PROMISE TO KIMBER: THE CHRONICLE OF AMERICA'S TOUGHEST ANTI-CRIME LAW (1996).

**104.** 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003).

**105.** *Id.* at 15, 123 S.Ct. 1179 (O'Connor, J.) (quoting Cal.Penal Code Ann. § 667(b)).

**106.** *Id.* at 30, 123 S.Ct. 1179.

**107.** 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

that case, the defendant was convicted of a third felony for obtaining $120 by false pretenses and was sentenced to mandatory life imprisonment under a recidivist statute. The Court found it important to examine the "exact operation" of the statute at issue and found three important factors suggesting a legitimate basis for such a harsh punishment:

First, [Rummel] had to be convicted of a felony and actually sentenced to prison. Second, at some time subsequent to his first conviction, Rummel had to be convicted of another felony and again sentenced to imprisonment. Finally, after having been sent to prison a second time, Rummel had to be convicted of a third felony.... Given this necessary sequence, *a recidivist must twice demonstrate that conviction and actual imprisonment do not deter him from returning to crime once he is released.* One in Rummel's position has been both graphically informed of the consequences of lawlessness and given an opportunity to reform, all to no avail.[108]

While some might raise theoretical objections to such recidivist statutes,[109] their underlying logic is clear and unassailable. But no such logic can justify § 924(c), at least when applied to first offenders such as Mr. Angelos. In cases such as his, the statute blindly draws no distinction between recidivists and first-time offenders. For this reason as well, the statute appears to be irrational as applied in this case.

The irrationality only increases when section § 924(c) is compared to the federal "three strikes" provision. Criminals with two prior violent felony convictions who commit a third such offense are subject to

"mandatory" life imprisonment under 18 U.S.C. § 3559(c)—the federal "three-strikes" law. But then under 18 U.S.C. § 3582(c)(1)—commonly known as the "compassionate release" provision—these criminals can be released at age 70 if they have served 30 years in prison. But because this compassionate release provision applies to sentences imposed under § 3559(c)—not § 924(c)—offenders like Mr. Angelos are not eligible. Thus, while the 24-year-old Mr. Angelos must serve time until he is well into his 70's, a 40-year-old recidivist criminal who commits second degree murder, hijacks an aircraft, or rapes a child is potentially eligible for release at age 70. In other words, mandatory life imprisonment under the federal three-strikes law for persons guilty of three violent felony convictions is less mandatory than mandatory time imposed on the first-time offender under § 924(c). Again, the rationality of this arrangement is dubious.

This possibility, too, is no mere hypothetical. This morning, the court had before it for sentencing Thomas Ray Gurule.[110] Mr. Gurule is 54-years-old with a lifelong history of criminal activity and drug abuse. He has spent more of his life incarcerated than he has in the community. He has sixteen adult criminal convictions on his record, including two robbery convictions involving dangerous weapons. His most recent conviction was for carjacking. In August 2003, after failing to pay for gas at a service station, Mr. Gurule was pursued by the station manager. To escape, Mr. Gurule broke into the home of a young woman, held her at knife point, stole her jewelry, and forced her to drive

---

**108.** 445 U.S. at 278, 100 S.Ct. 1133 (emphasis added).

**109.** *See, e.g.,* Markus Dirk Dubber, Recidivist Statutes as Arational Punishment, 43 BUFF. L.REV. 689 (1996).

**110.** *United States v. Gurule,* No. 2:04–CR–209–PGC.

him away from the scene of his crimes. During the drive, Mr. Gurule threatened both the woman and her family.

For this serious offense—the latest in a long string of crimes for which he has been convicted—the court must apparently sentence Mr. Gurule to "life" in prison under 18 U.S.C. § 3559(c). But because of the compassionate release provision, Mr. Gurule is eligible for release after serving 30–years of his sentence. Why Mr. Gurule, a career criminal, should be eligible for this compassionate release while Mr. Angelos is not obvious to the court.

### 4. Demeaning Victims of Actual Violence and Creating the Risk of Backlash

For the reasons outlined in the previous section, § 924(c) imposes unjust punishment and creates irrational classifications between different offenses and different offenders. To some, this may seem like a law professor's argument—one that may have some validity in the classroom but little salience in the real world. After all, the only issue in this case is the extent of punishment for a man justly convicted of serious drug trafficking offenses. So what, some may say, if he spends more years in prison than might be theoretically justified? It is common wisdom that "if you can't do the time, don't do the crime."

The problem with this simplistic position is that it overlooks other interests that are inevitably involved in the imposition of a criminal sentence. For example, crime victims expect that the penalties the court imposes will fairly reflect the harms that they have suffered. When the sentence for actual violence inflicted on a victim is dwarfed by a sentence for carrying guns to several drug deals, the implicit message to

victims is that their pain and suffering counts for less than some abstract "war on drugs."

This is no mere academic point, as a case from this court's docket will illustrate. Earlier today, shortly before Mr. Angelos' hearing, the court imposed sentence in *United States v. Visinaiz,* 344 F.Supp.2d 1310 (D.Utah 2004), a second-degree murder case.[111] There, a jury convicted Cruz Joaquin Visinaiz of second-degree murder in the death of 68–year–old Clara Jenkins. On one evening, while drinking together, the two got into an argument. Ms. Jenkins threw an empty bottle at Mr. Visinaiz, who then proceeded to beat her to death by striking her in the head at least three times with a log. Mr. Visinaiz then hid the body in a crawl space of his home, later dumping the body in a river weighted down with cement blocks. Following his conviction for second-degree murder, Mr. Visinaiz came before the court as a first-time offender for sentencing. The Sentencing Guidelines require a sentence for this brutal second-degree murder of between 210 to 262 months.[112] The government called this an "aggravated second-degree murder" and recommended a sentence of 262 months. The court followed that recommendation. Yet on the same day, the court is to impose a sentence of 738 months for a first–time drug dealer who carried a gun to several drug deals!? The victim's family in the Visinaiz case—not to mention victims of a vast array of other violent crimes—can be forgiven if they think that the federal criminal justice system minimizes their losses. No doubt § 924(c) is motivated by the best of intentions—to prevent criminal victimization. But the statute pursues that goal in a way that effectively sends a message to victims

---

**111.** *United States v. Visinaiz,* 344 F.Supp.2d 1310.

**112.** U.S.S.G. § 2A1.2 (offense level of 33) + § 3A1.1(b) (two-level increase for vulnerable

victim) + § 3C1.1 (two-level increase for obstruction of justice).

of actual criminal violence that their suffering is not fully considered by the system.

Another reason for concern is that the unjust penalties imposed by § 924(c) can be expected to attract public notice. As shown earlier, applying § 924(c) to cases such as this one leads to sentences far in excess of what the public believes is appropriate. Perhaps in the short term, no ill effects will come from the difference between public expectations and actual sentences. But in the longer term, the federal criminal justice system will suffer. Most seriously, jurors may stop voting to convict drug dealers in federal criminal prosecutions if they are aware that unjust punishment may follow. It only takes a single juror who is worried about unjust sentencing to "hang" a jury and prevent a conviction. This is not an abstract concern. In the case of *United States v. Molina*[113] the jury failed to reach a verdict on a § 924(c) count which would have added 30 years to the defendant's sentence. Judge Weinstein, commenting on "the dubious state of our criminal sentencing law"[114] noted that "[j]ury nullification of sentences deemed too harsh is increasingly reflected in refusals to convict."[115] In the last several drug trials before this court, jurors have privately expressed considerable concern after their verdicts about what sentences might be imposed. If federal juries are to continue to convict the guilty, those juries must have confidence that just punishment will follow from their verdicts.

### C. Justifications for § 924(c)

Given these many problems with § 924(c) as applied to this case—its imposition of unjust punishment, its irrational classifications between offenses and of-

fenders, and its demeaning of victims of actual criminal violence—what can be said on behalf of the statute? The Sentencing Commission has catalogued the six rationales that are said to undergird mandatory sentencing schemes such as § 924(c):

(1) Assuring "just" (i.e. appropriately severe) punishment, (2) elimination of sentence disparities, (3) judicial economies resulting from increased pressure on defendants to plead guilty, (4) stronger inducements for knowledgeable offenders to cooperate in the investigation of others, (5) more effective deterrence, and (6) more effective incapacitation of the serious offender.[116]

These six justifications potentially apply to § 924(c), and the court will consider them as they are advanced by the government.

In its skillfully-argued defense of the § 924(c) sentence here, the government does not rely on the first rationale—the "just punishment" rationale—presumably because the sentence to be imposed on Mr. Angelos appears to be unjust by any reasonable objective measure.

Nor does the government advance the second rationale: that § 924(c) eliminates sentence disparities. Again, the reasons are easy to see. Section 924(c) displaces a carefully-developed sentencing guideline system that would assure that Mr. Angelos receives equal punishment with other similarly-placed offenders. Indeed, § 924(c) creates the potential for tremendous sentencing disparity if federal prosecutors across the country do not uniformly charge § 924(c) violations. Such concerns are founded in real world data. In 1991, the Sentencing Commission found that only about 45 percent of drug offenders who qualified for a § 924(c) enhancement were initially charged under the statute, and for

---

**113.** 963 F.Supp. 213 (E.D.N.Y.1997).

**114.** *Id.* at 213.

**115.** *Id.* at 214.

**116.** Sentencing Comm. Mandatory Minimum Report, *supra*, at 5–15.

26 percent of these offenders the counts were later dismissed.[117] In 1995, the Commission again found that only a minority of qualified offenders—between 24 and 44 percent—were convicted and sentenced for applicable § 924(c)'s.[118] Again in 2000, the Commission found a pattern of inconsistent application. Only between 10 and 30 percent of drug offenders who personally used, carried, or possessed a weapon in furtherance of a crime received the statutory enhancement.[119]

The Justice Department has recently taken partial steps to reduce charging disparities stemming from § 924(c). A directive from the Attorney General—the so-called "Ashcroft Memorandum"—requires that prosecutors shall file the first readily provable § 924(c) count and a second count in certain circumstances:

(i) In all but exceptional cases or where the total sentence would not be affected, the first readily provable violation of 18 U.S.C. § 924(c) shall be charged and pursued.

(ii) In cases involving three or more readily provable violations of 18 U.S.C. § 924(c) in which the predicate offenses are *crimes of violence,* federal prosecutors shall, in all but exceptional cases, charge and pursue the first *two* such violations.[120]

As applied to the facts of this case, the Ashcroft Memorandum seems only to highlight the problem of disparity rather than resolve it. First, when three or more violations of § 924(c) are involved, the directive requires federal prosecutors to "pursue the first *two* violations." In this case, the prosecutors pursued *five* violations, ultimately obtaining convictions on *three.* It seems likely that the prosecutors' charging decisions in this case would not have been replicated in other parts of the country. Second, the directive requires federal prosecutors to pursue at least two § 924(c) counts when the predicate offenses are "crimes of violence." Here, the predicates were drug crimes, which the directive does not discuss. Thus, the directive offers no guidance as to whether the prosecutors handling this case should have pursued multiple § 924(c) counts and, if so, how many.

There is also a lack of guidance to federal agents investigating these crimes. In this case, for example, the government did not arrest Mr. Angelos immediately after the first "controlled buy," but instead arranged two more such buys, which then produced one of the additional § 924(c) counts. It is not clear to the court that other law enforcement agents would have allowed Mr. Angelos to continue to deal drugs after the first buy rather than taking him into custody immediately. Of course, one of the rationales for the "stacking" feature of § 924(c) is that each additional criminal act demonstrates need for further deterrence. In this case, though, the additional criminal acts were in some sense procured by the government.

Because of the lack of guidance on these prosecutory and investigative issues, Mr. Angelos is probably receiving a sentence far in excess of what many other identically-situated offenders will receive for identical crimes in other federal districts. The court has been advised by judges from other parts of the country that, in their

117. See Sentencing Comm. Mandatory Minimum Report at 57–58.

118. See Paul J. Hofer, *Federal Sentencing for Violent and Drug Trafficking Crimes Involving Firearms: Recent Changes and Prospects for Improvement,* 37 Am.Crim. L.Rev. 41 (2000).

119. Statement of John R. Steer to the ABA Justice Kennedy Commission, *supra,* at 17.

120. Mem. to All Federal Prosecutors from A.G. John Ashcroft Re: Dep't Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing at 4 (Sept. 22, 2003) (emphases added).

districts, an offender like Mr. Angelos would not have been charged with multiple § 924(c) counts. This is no trivial matter. The decision to pursue, for example, a third § 924(c) count in this case makes the difference between a 36–year–sentence and 61–year sentence. In short, § 924(c) as applied in this case seems to create the serious risk of massive sentencing disparity between identically-situated offenders within the federal system. And the problem of disparity only worsens if we acknowledge the fact that Mr. Angelos would not have been charged with federal crimes in many other states. For all these reasons, the government could not plausibly defend § 924(c) on an eliminating-disparity rationale.

The government has also not advanced the third rationale—judicial economies resulting from increased pressure on defendants to plead guilty. Here again, it is possible to understand the government's reluctance. While it is constitutionally permissible for the government to threaten to file enhanced charges against a defendant who fails to plead guilty,[121] there is always the nagging suspicion that the practice is unseemly. In this case, for example, the government initially offered Mr. Angelos a plea bargain in which he would receive a fifteen-year-sentence under one § 924(c) count. When he had the temerity to decline, the government filed superseding indictments adding four additional § 924(c) counts. So far as the court can determine, the superceding indictment rested not on any newly-discovered evidenced but rather solely on the defen-

dant's unwillingness to plead guilty. Moreover, if its plea-inducing properties justify § 924(c), then it is important to understand who will be induced to plead. Section 924(c) will not visit its harsh punishment "on flagrantly guilty repeat offenders (who avoid the mandatory by their guilty pleas), but rather on first offenders in borderline situations (who may have plausible defenses and are more likely to insist upon trial)."[122] For all these reasons, it is understandable that the government would not want to publicly defend § 924(c) with the plea-inducing argument, even though given the realities of overworked prosecutors this may provide a true justification for the statute. Nor has the government argued that § 924(c) is needed to provide incentives for drug traffickers to inform on others in their organization.[123] Instead, the rationale advanced by government is deterrence and incapacitation: the draconian provisions of § 924(c) are necessary to deter drug dealers from committing crimes with those firearms and to prevent Mr. Angelos from doing so in the future.

The deterrence argument rests on a strong intuitive logic. Sending a message to drug dealers that they will serve additional time in prison if they are caught with firearms may lead some to avoid firearms entirely and others to leave their firearms at home. The Supreme Court has specifically noted "the deterrence rationale of § 924(c),"[124] explaining that a fundamental purpose behind § 924(c) was to combat the dangerous combination of drugs and firearms.[125] Congress is cer-

---

**121.** *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

**122.** Stephen J. Schullhofer, *Rethinking Mandatory Minimums,* 28 WAKE FOREST L.REV. 199, 203 (1993).

**123.** *Cf.* Jay Apperson, *The Lock-'em Up Debate: What Prosecutors Know: Mandatory*

*Minimums Work,* WASH. POST. Feb. 27, 1994 at C1.

**124.** *Simpson,* 435 U.S. at 14, 98 S.Ct. 909.

**125.** *Smith v. United States,* 508 U.S. 223, 240, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

tainly entitled to legislate based on the belief that § 924(c) will "persuade the man tempted to commit a Federal felony to leave his gun at home." [126]

Congress' belief is, moreover, supported by empirical evidence. Generally criminologists believe that an increase in prison populations will reduce crime through both a deterrent and incapacitative effect. The consensus view appears to be that each 10% increase in the prison population produces about a 1% to 3% decrease in serious crimes. [127] For example, one recent study concluded that California's three strikes law prevented 8 murders, 4000 aggravated assaults, 10,000 robberies, and 400,000 burglaries in its first two years of operation. [128] One study found that Congress' financial incentives to states to which (like the federal system) force violent offenders to serve 85% of their sentences decreased murders by 16%, aggravated assaults by 12%, robberies by 24%, rapes by 12%, and larcenies by 3%. While offenders "substituted" into less harmful property crimes, the overall reduction in crime was significant. [129] While no specific study has examined § 924(c), it is reasonable to assume—and Congress is entitled to assume—that it has prevented some serious drug and firearms offenses.

The problem with the deterrence argument, however, is that it proves too much. A statute that provides mandatory life sentences for jaywalking or petty theft would, no doubt, deter those offenses. But it would be hard to view such hypothetical statutes as resting on rational premises. Moreover, a mandatory life sentence for petty theft, for example, would raise the question of why such penalties were not in place for aircraft hijacking, second-degree murder, rape, and other serious crimes. Finally, deterrence comes at a price. Given that holding a person in federal prison costs about $23,000 per year, [130] the 61–year–sentence the court is being asked to impose in this case will cost the taxpayers (even assuming Mr. Angelos receives good time credit and serves "only" 55–years) about $1,265,000. Spending more than a million dollars to incarcerate Mr. Angelos will prevent future crimes by him and may well deter some others from being involved with drugs and guns. But that money could also be spent on other law enforcement or social programs that in all likelihood would produce greater reductions in crime and victimization. [131]

If the court were to evaluate these competing tradeoffs, it would conclude that stacking § 924(c) counts on top of each other for first-time drug offenders who have merely possessed firearms is not a cost-effective way of obtaining deterrence. It is not enough to simply be "tough" on crime. Given limited resources in our society, we also have to be "smart" in the way we allocate our resources. But these tradeoffs are the subject of reasonable de-

**126.** 114 Cong. Rec. 22, 231–48 (1968) (Statement of Rep. Poff).

**127.** *See, e.g.,* Steven D. Levitt, *The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation,* 111 Q.J. Econ. 319 (1996); James Q. Wilson, *Prisons in a Free Society,* 117 Pub. Interest 37, 38 (1998).

**128.** *See, e.g.,* Joanna M. Shepherd, *Fear of the First Strike: The Full Deterrent Effect of California's Two–and Three–Strikes Legislation,* 31 J. Legal Stud. 159 (2002).

**129.** Joanna M. Shepherd, *Police, Prosecutors, Criminals, and Determinate Sentencing: The Truth About Truth–in–Sentencing Laws,* 45 J.L. & Econ. 509 (2002).

**130.** Memorandum to All Chief Probation Officers from the Administrative Office of the U.S. Courts Regarding Costs of Incarceration and Supervision (March 31, 2004).

**131.** *See* John J. Donohue III & Peter Siegelman, *Allocating Resources Among Prisons and Social Programs in the Battle Against Crime,* 27 J. Legal Stud. 1 (1998).

bate. It is not the proper business of the court to second-guess the congressional judgment that § 924(c) is a wise investment of resources. Instead, in conducting rational basis review of the statute, the court is only to determine whether "any ground can be conceived to justify [the statutory scheme] as rationally related to a legitimate government interest."[132] "Where there are 'plausible reasons' for Congress' action, [the court's] inquiry is at an end."[133] In *Busic* referring to *Simpson*, the Supreme Court recognized that § 924(c) could lead to "seemingly unreasonable comparative sentences" but that "[i]f corrective action is needed it is the Congress that must provide it. It is not for us to speculate, much less act, on whether Congress would have altered its stance had the specific events of this case been anticipated."[134] The Court further noted that "in our constitutional system the commitment to separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'commonsense and the public weal.' "[135]

Accordingly, the court reluctantly concludes that § 924(c) survives rational basis scrutiny. While it imposes unjust punishment and creates irrational classifications, there is a "plausible reason" for Congress' action. As a result, this court's obligation is to follow the law and to reject Mr. Angelos' equal protection challenge to the statute.

## IV. Cruel and Unusual Punishment

In addition to raising an equal protection argument, Mr. Angelos also argues that his 55–year sentence under § 924(c) violates the Eighth Amendment's prohibition of cruel and unusual punishment. In this argument, he is joined in an *amicus* brief filed by a distinguished group of 29 former United States District Judges, United States Circuit Court Judges, and United States Attorneys,[136] who draw on their expertise in federal criminal law and federal sentencing issues to urge that the sentence is unconstitutional as disproportionate to the offenses at hand.

Mr. Angelos and his supporting *amici* are correct in urging that controlling Eighth Amendment case law places an outer limit on punishments that can be imposed for criminal offenses, forbidding penalties that are grossly disproportionate to any offense. This principle traces its roots to the Supreme Court's 1983 decision in *Solem v. Helm*,[137] in which the Supreme Court seemed to modify its earlier holding in *Rummel v. Estelle*[138] and "h[e]ld as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convict-

**132.** *Lee*, 957 F.2d at 782 citing *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

**133.** *Beach Communications*, 508 U.S. at 313–14, 113 S.Ct. 2096.

**134.** *Busic*, 446 U.S. at 405, 100 S.Ct. 1747 citing *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

**135.** *Id.* at 410, 100 S.Ct. 1747.

**136.** Buck Buchanan, Zachary W. Carter, Robert J. Cindrich, Robert J. Cleary, Veronica F. Coleman–Davis, Robert J. Del Tufo, W. Thomas Dillard, John J. Gibbons, Saul A. Green, J. Alan Johnson, James E. Johnson, Gaynelle Griffin Jones, Nathaniel R. Jones, Nicholas Katzenbach, Timothy K. Lewis, Andrew J. Maloney, John S. Martin Jr., William A. Norris, Denise E. O'Donnell, Stephen M. Orlofsky, A. John Pappalardo, James G. Richmond, Benito Romano, Stanley J. Roszkowski, Herbert J. Stern, Harold R. Tyler Jr., Ronald Woods, Sharon J. Zealey, Donald E. Ziegler.

**137.** 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

**138.** 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

ed." [139] The principles of *Solem* were themselves seemingly modified by the Court's fractured 1991 decision in *Harmelin v. Michigan,*[140] in which the Court held that imposition of a life sentence without possibility of parole for possession of 650 grams of cocaine did not violate the Eighth Amendment. Then, last year, the Supreme Court confirmed that the gross disproportionality principle—"the precise contours of which are unclear" [141]—is applicable to sentences for terms of years; that there was a "lack of clarity" in its precedents; [142] that it had "not established a clear or consistent path for courts to follow;" [143] and that the proportionality principles from Justice Kennedy's *Harmelin* concurrence "guide our application of the Eighth Amendment." [144] The Tenth Circuit, too, has instructed that "Justice Kennedy's opinion controls because it both retains proportionality and narrows *Solem.*" [145]

■ In light of these controlling holdings, the court must engage in a proportionality analysis guided by factors outlined in Justice Kennedy's *Harmelin* concurrence. In particular, the court must examine (1) the nature of the crime and its relation to the punishment imposed, (2) the punishment for other offenses in this jurisdiction, and (3) the punishment for similar offenses in other jurisdictions.

■ Before turning to these *Harmelin* factors, it is important to emphasize that the criminal conduct at issue is solely that covered by the three § 924(c) counts. Mr. Angelos will be fully and appropriately punished for all other criminal conduct from the sentence on these other counts. Thus, the proportionality question in this case boils down to whether the 55–year sentence is November 16, 2004 disproportionate to the offense of carrying or possessing firearms three times in connection with dealing marijuana.

### A. Mr. Angelos' Offenses and the Contemplated Penalty

The first *Harmelin* factor requires the court to compare the seriousness of the three § 924(c) offenses to the harshness of the contemplated penalty to determine if the penalty would be grossly disproportionate to such offenses. In weighing the gravity of the offenses, the court should consider the offenses of conviction and the defendant's criminal history,[146] as well as "the harm caused or threatened to the victim or society, and the culpability of the offender." [147] Simply put, "[d]isproportionality analysis measures the relationship between the nature and number of offenses committed and the severity of the punishment inflicted upon the offender." [148]

The criminal history in this case is easy to describe. Mr. Angelos has no prior

**139.** *Id.* at 289, 100 S.Ct. 1133.

**140.** 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

**141.** *Lockyer v. Andrade,* 538 U.S. 63, 64, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

**142.** *Id.* at 74 n. 1, 123 S.Ct. 1166 (2003).

**143.** *Id.* at 72–73, 123 S.Ct. 1166.

**144.** *Ewing v. California,* 538 U.S. 11, 23–24, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (O'Connor, J.).

**145.** *See Hawkins v. Hargett,* 200 F.3d 1279, 1282 (10th Cir.1999), *cert. denied,* 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000).

**146.** *See Ewing,* 538 U.S. at 29, 123 S.Ct. 1179 (O'Connor, J.).

**147.** *Solem,* 463 U.S. at 292–294, 103 S.Ct. 3001.

**148.** *Id.* at 288, 103 S.Ct. 3001.

adult criminal convictions and is treated as a first-time offender under the Sentencing Guidelines.

The sentence-triggering criminal conduct in this case is also modest. Here, on two occasions while selling small amounts of marijuana, Mr. Angelos possessed a handgun under his clothing, but he never brandished or used the handgun. The third relevant crime occurred when the police searched his home and found handguns in his residence. These handguns had multiple purposes—including recreational activities—but because Mr. Angelos also used the gun to protect himself while dealing drugs, the possession of these handguns is also covered by § 924(c).[149]

Mr. Angelos did not engage in force or violence, or threats of force or violence, in furtherance of or in connection with the offenses for which he has been convicted. No offense involved injury to any person or the threat of injury to any person. It is well-established that crimes marked by violence or threat of violence are more serious [150] and that the absence of direct violence affects the strength of society's interest in punishing a particular criminal.[151]

It is relevant on this point that the Sentencing Commission has reviewed crimes like Mr. Angelos' and concluded that an appropriate penalty for all of Mr. Angelos' crimes is no more than about ten years (121 months).[152] With respect to the firearms conduct specifically, the Commission has concluded that about 24 months (a two-level enhancement) is the appropriate

penalty.[153] The views of the Commission are entitled to special weight, because it is a congressionally-established expert agency which can draw on significant data and other resources in determining appropriate sentences. Comparing a recommended sentence of two years to the 55-year enhancement the court must impose strongly suggests not merely disproportionality, but gross disproportionality.

## B. Comparison to Penalties for Other Offenses

The next *Harmelin* factor requires comparing Mr. Angelos' sentence with the sentences imposed on other criminals in the federal system.[154] Generally, "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." [155] This factor points strongly in favor of finding that the sentence in this case is excessive. As shown in Tables I and II earlier in this opinion, Mr. Angelos will receive a far longer sentence than those imposed in the federal system for such major crimes as aircraft hijacking, second-degree murder, racial beating inflicting life-threatening injuries, kidnapping, and rape. Indeed, Mr. Angelos will receive a far longer sentence than those imposed for three aircraft hijackings, three second-degree murders, three racial beatings inflicting life-threatening injuries, three kidnappings, and three rapes. Because Mr. Angelos is "treated in the same manner as, or more severely than, criminals who have committed far more serious crimes," [156] it appears that the second factor is satisfied.

---

**149.** *See* PSR ¶ 73.

**150.** *See Solem,* 463 U.S. at 292–293, 103 S.Ct. 3001.

**151.** *See Rummel,* 445 U.S. at 275, 100 S.Ct. 1133.

**152.** *See* Part III.B.2, *supra.*

**153.** *See id.*

**154.** *Harmelin,* 501 U.S. at 1004–05, 111 S.Ct. 2680 (Kennedy, J., concurring).

**155.** *Solem,* 463 U.S. at 291, 103 S.Ct. 3001.

**156.** *Id.* at 299, 103 S.Ct. 3001.

## C. Comparison to Other Jurisdictions

The final *Harmelin* factor requires the court to examine "sentences imposed for the same crime in other jurisdictions."[157] Evaluating this factor is also straightforward. Mr. Angelos sentence is longer than he would receive in any of the fifty states. The government commendably concedes this point in its brief, pointing out that in Washington State Mr. Angelos would serve about nine years and in Utah would serve about five to seven years.[158] Accordingly, the court finds that the third factor is satisfied.

## D. Application of the *Harmelin* Factors in Light of *Davis*

Having analyzed the three *Harmelin* factors, the court believes that they lead to the conclusion that Mr. Angelos' sentence violates the Eighth Amendment. But before the court declares the sentence unconstitutional, there is one last obstacle to overcome. The court is keenly aware of its obligation to follow precedent from superior courts—specifically the Tenth Circuit and, of course, the Supreme Court. The Supreme Court has considered one case that might be regarded as quite similar to this one. In *Hutto v. Davis*,[159] the Supreme Court held that two consecutive twenty-year sentences—totaling forty years—for possession of nine ounces of marijuana said to be worth $200 did not violate the Eighth Amendment. If *Davis* remains good law, it is hard see how the sentence in this case violates the Eighth Amendment. Here, Mr. Angelos was involved in at least two marijuana deals involving $700 and approximately sixteen ounces (one pound) of marijuana. Perhaps currency inflation could equate $700 today with $200 in the 1980's. But as a simple matter of arithmetic, if 40 years in prison for possessing nine ounces marijuana does not violate the Eighth Amendment, it is hard to see how 61 years for distributing sixteen ounces (or more) would do so.

The court is aware of an argument that the 1982 *Davis* decision has been implicitly overruled or narrowed by the 1983 *Solem* decision and other more recent pronouncements. For example, Justice Kennedy's concurring opinion in *Harmelin*, explained that "[o]ur most recent pronouncement on the subject in *Solem* appeared to apply a different analysis than in... *Davis*."[160] But the Court apparently continues to view *Davis* as part of the fabric of the law. Thus, Justice Kennedy's concurrence in *Harmelin*, after noting the seeming overruling of *Davis*, went on to discuss *Davis* along with other cases in distilling various "common principles" that control Eighth Amendment analysis.[161] Justice Kennedy also explained in Harmelin that his approach "takes full account of ... *Davis*, [a] case[ ] ignored by the dissent."[162] More recently, in reviewing California's "three strikes" legislation last year, the plurality opinion reviewed *Davis* as one of a string of cases that guide analysis of Eighth Amendment challenges.[163]

**157.** *Harmelin*, 501 U.S. at 1005, 111 S.Ct. 2680 (Kennedy, J., concurring).

**158.** Government's Resp. Mem. Re: Constitutionality of Mandatory Minimum Sentences Pursuant to 18 U.S.C. § 924(c) at 23.

**159.** 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982).

**160.** 501 U.S. at 997, 111 S.Ct. 2680 (Kennedy, J., concurring).

**161.** *Id.* at 998, 111 S.Ct. 2680 (Kennedy, J., concurring); *see also id.* at 1004, 1005, 111 S.Ct. 2680 (Kennedy, J., concurring).

**162.** *Id.* at 1005, 111 S.Ct. 2680 (Kennedy, J., concurring).

**163.** *Ewing*, 538 U.S. at 21, 123 S.Ct. 1179 (O'Connor, J.).

In light of these continued references to *Davis*, the court believes it is it obligated to follow its holding here. Indeed, in *Davis* the Supreme Court pointedly reminded district court judges that "unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts...." [164] Under *Davis*, Mr. Angelos' sentence is not cruel and unusual punishment. Therefore, his Eighth Amendment challenge must be rejected.

## V. Calculating the Sentence

With Mr. Angelos' constitutional challenges to the 55-year sentence on § 924(c) counts resolved, the remaining issue before the court is the sentence to be imposed on the other counts. Mr. Angelos raises a constitutional challenge to the 78–97 month sentence called for by the Sentencing Guidelines for his thirteen other offenses. He notes that the Guidelines calculation rests on enhancements that were never submitted to the jury, in particular enhancements based on the quantity of drugs involved and the amount of money laundered. Under this court's decision in *United States v. Croxford*[165] interpreting *Blakely v. Washington*,[166] these enhancements extend the maximum penalty that can be imposed on Mr. Angelos beyond that supported by the jury's verdict. *Croxford* explains that the Sixth Amendment as interpreted in *Blakely* requires jury fact-finding on such issues as drug quantities and dollar values. The court therefore holds that the Guidelines are unconstitutional as applied to Mr. Angelos.

Without the Guidelines, the court is free to make its own determination of what is an appropriate sentence for these thirteen offenses. In making that determination, the court consults the Guidelines as instructive but not binding.[167] If the sentence on these thirteen counts was the only sentence that Mr. Angelos would serve, a sentence of about 78–97 months might well be appropriate. But the court cannot ignore the reality that Mr. Angelos will also be sentenced to 55 years on the § 924(c) counts, far in excess of what is just punishment for all of his crimes. In light of this 55-year sentence, and having considered all of the relevant factors listed in the Sentencing Reform Act,[168] the court will impose a sentence of one day in prison for all offenses other than the § 924(c) counts. Lest anyone think that this is a "soft" sentence, in combination with the § 924(c) counts, the result is that Mr. Angelos will not walk outside of prison until after he reaches the age of 70.

Not content with a mere 55-year sentence in this case, the government argues that the court may not depart downward from the Guidelines simply because of the penalties imposed by the § 924(c) counts. Its argument rests on *United States v. Thornbrugh*,[169] in which the Tenth Circuit found it was an abuse of discretion for a district court to depart from the Guidelines because of the harsh effects of § 924(c). But for the reasons articulated in *Croxford*, the Guidelines no longer bind the court in this case. Therefore, the court need not "depart" from the Guidelines to impose a one day sentence, and thus the

---

**164.** *Davis*, 454 U.S. at 375, 102 S.Ct. 703.

**165.** 324 F.Supp.2d 1230 (D.Utah 2004); *see also United States v. Booker*, — U.S. —, 125 S.Ct. 11, 159 L.Ed.2d 838 (2004)(granting certiorari to review this issue).

**166.** — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**167.** *See Croxford*, 324 F.Supp.2d at 1248.

**168.** 18 U.S.C. § 3553(a) (listing factors to be considering in imposing sentence).

**169.** 7 F.3d 1471 (10th Cir.1993).

analysis of departures in *Thornbrugh* is not controlling in this case.

## VI. Recommendations to Other Branches of Government

Having disposed of the legal arguments in this case, it seems appropriate to make some concluding, personal observations. I have been on the bench for nearly two-and-half years now. During that time, I have sentenced several hundred offenders under the Sentencing Guidelines and federal mandatory minimum statutes. By and large, the sentences I have been required to impose have been tough but fair. In a few cases, to be sure, I have felt that either the Guidelines or the mandatory minimums produced excessive punishment. But even in those cases, the sentences seemed to be within the realm of reason.

This case is different. It involves a first offender who will receive a life sentence for crimes far less serious than those committed by many other offenders—including violent offenders and even a murderer—who have been before me. For the reasons explained in my opinion, I am legally obligated to impose this sentence. But I feel ethically obligated to bring this injustice to the attention of those who are in a position to do something about it.

### A. Recommendation for Executive Commutation

For all the reasons previously given, an additional 55–year sentence for Mr. Angelos under § 924(c) is unjust, disproportionate to his offense, demeaning to victims of actual criminal violence—but nonetheless constitutional. While I must impose the unjust sentence, our system of separated powers provides a means of redress. The

Framers were well aware that "[t]he administration of justice . . . is not necessarily always wise or certainly considerate of circumstances which may properly mitigate guilt." [170] In my mind, this is one of those rare cases where the system has malfunctioned. "To afford a remedy, it has always been thought essential in popular governments, as well as in monarchies, to vest in some other authority than the courts power to ameliorate or avoid particular criminal judgments." [171] Under our Constitution, the President has "the Power to grant Reprieves and Pardons for Offenses against the United States. . . ." [172] One of the purposes of executive clemency is "to afford relief from undue harshness." [173] This power is absolute. "The executive can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress." [174]

Given that the President has the exclusive power to commute sentences, the question arises as to whether I have any role to play in commutation decisions, *i.e.,* is it appropriate for me to make a commutation recommendation to the President. Having carefully reviewed the issue, I believe that such a recommendation is entirely proper. The President presumably wants the fullest array of information regarding cases in which a commutation might be appropriate. Moreover, the Executive Branch has indicated that it actively solicits the views of sentencing judges on pardon and commutation requests. The Office of the Pardon Attorney in the Department of Justice is responsible for

---

170. *Ex parte Grossman,* 267 U.S. 87, 120, 45 S.Ct. 332, 69 L.Ed. 527 (1925).

171. *Id.* at 121, 45 S.Ct. 332.

172. U.S. Const., art. I, § 2.

173. *Id.*

174. *Ex parte Grossman,* 267 U.S. at 120, 45 S.Ct. 332.

handling requests for pardons and commutations. According to the U.S. Attorney's Manual Standards for Consideration of Clemency Petitions, the Pardon Attorney "routinely requests ... the views and recommendations of the sentencing judge" on any request for commutation.[175]

I therefore believe that it is appropriate for me to communicate to the President, through the Office of the Pardon Attorney, my views regarding Mr. Angelos' sentence. I recommend that the President commute Mr. Angelos' sentence to a prison term of no more than 18 years, the average sentence recommended by the jury that heard this case.[176] The court agrees with the jury that this is an appropriate sentence in this matter in light of all of the other facts discussed in this opinion. The Clerk's Office is directed to forward a copy of this opinion with its commutation recommendation to the Office of Pardon Attorney.

## B. Recommendation for Legislative Reform

While a Presidential commutation of Mr. Angelos' sentence would resolve his particular case, § 924(c) remains in place and will continue to create injustices in future cases. For the reasons explained in this opinion, the problem stems from the count stacking features of mandatory minimum sentences. In our system of separate powers, general correction of this problem lies in the hands of Congress which is possessed of the "legislative powers" granted in the Constitution.[177]

Again, the question arises regarding whether it is appropriate for me to communicate with Congress regarding apparent problems that have arisen in applying the mandatory minimums in this case. Having carefully studied the issue, I conclude that such a communication is proper. As Judge Calabresi on the Second Circuit has noted, "[t]he tradition of courts engaging in dialogue with legislatures is too well-established in this and other courts to disregard."[178] Presumably Congress no less than the President desires feedback on how its statutes are operating. Congress also presumably wants to be informed in situations where its mandates are producing adverse effects, such as demeaning crime victims or risking a possible backlash from citizen juries.

Justice Anthony Kennedy recently commented on the roles of courts and legislatures in specific reference to mandatory minimums:

> The legislative branch has the obligation to determine whether a policy is wise. It is a grave mistake to retain a policy just because a court finds it constitutional. Courts may conclude the legislature is permitted to choose long sentences, but that does not mean long sentences are wise or just ... A court decision does not excuse the political branches or the public from the responsibility for unjust laws.[179]

---

**175.** U.S. Attorney's Manual § 1–2.111, available at www.usdoj.gov/pardon/petitions.htm.

**176.** *See* Part III. B.2, *supra*.

**177.** U.S. Const., art. I § 1.

**178.** *United States v. Then*, 56 F.3d 464, 466 (2nd Cir.1995) (Calabresi J., concurring) (citing *Computer Associates Intern., Inc., v. Altai, Inc.*, 982 F.2d 693, 712 (2nd Cir.1992)) (exhorting Congress to resolve an issue); *Brock*

*on Behalf of Williams v. Peabody Coal Co.*, 822 F.2d 1134, 1152–53 (D.C.Cir.1987) (Ginsburg, J., concurring) (stating that "Congressional attention to this matter may well be in order").

**179.** Associate Justice Anthony M. Kennedy, Speech at the American Bar Association Annual Meeting, at 4 (Aug. 9, 2003) *available at* http://www.supremecourtus.gov/publicinfo/speeches/sp—08—09—03.html (last visited November 16, 2004).

This court deals with sentencing matters on a daily basis and feels in a unique position to advise Congress on such matters. Congress itself has recognized the expertise of the judiciary in matters of sentencing by placing the Sentencing Commission in the judicial branch of government. As the Supreme Court noted in *Mistretta v. United States*,[180] "sentencing is a field in which the Judicial Branch long has exercised substantive or political judgment.... Congress placed the Commission in the Judicial Branch precisely because of the Judiciary's special knowledge and expertise." [181]

For all these reasons, it is appropriate for me to communicate with Congress concerning the need for legislative reform. I express no view on mandatory minimum sentencing schemes in general. But for the reasons discussed in this opinion, one particular feature of the federal scheme—the "count stacking" feature of § 924(c) for first-time offenders—has lead to an unjust result in this case and will lead to unjust results in other cases. Particularly in cases (like this one) that do not involve direct violence, Congress should consider repealing this feature and making § 924(c) a true recidivist statute of the three-strikes-and-you're-out variety. In other words, Congress should consider applying the second and subsequent § 924(c) enhancements only to defendants who have been previously convicted of a serious offense, rather than to first-time offenders like Mr. Angelos. This is an approach to § 924(c) that the Tenth Circuit [182] and Justices Stevens, O'Connor, and Blackmun [183] believed Congress intended. It is an approach to sentencing that makes good

sense. The Clerk's Office is directed to forward a copy of this opinion to the Chair and Ranking Member of the House and Senate Judiciary Committees.

## CONCLUSION

The 55-year sentence mandated by § 924(c) in this case appears to be unjust, cruel, and irrational. But our constitutional system of government requires the court to follow the law, not its own personal views about what the law ought to be. Perhaps the court has overlooked some legal point, and that the appellate courts will find Mr. Angelos' sentence invalid. But applying the law as the court understands it, the court sentences Mr. Angelos to serve a term of imprisonment of 55 years and one day. The court recommends that the President commute this unjust sentence and that the Congress modify the laws that produced it. The Clerk's Office is directed to forward a copy of this opinion with its commutation recommendation to the Office of Pardon Attorney and to the Chair and Ranking Member of the House and Senate Judiciary Committees.

---

**180.** 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

**181.** *Id.* at 396, 109 S.Ct. 647.

**182.** *United States v. Chalan,* 812 F.2d 1302, 1315 (10th Cir.1987).

**183.** *Deal v. United States,* 508 U.S. at 137, 113 S.Ct. 1993 (Stevens, J., dissenting).